UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
       v.                      )      No. 4:10CR253 CEJ
                               )                  (FRB)
JAMAAL CURRY JOHNSON,          )
                               )
              Defendant.       )

**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**


     All pretrial motions in the above cause were referred to

the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b).  The defendant filed numerous pretrial motions,

including,

     1.  Motion To Suppress Statements And Illegally Seized
         Evidence (Docket No. 43); and

     2.  Motion To Suppress Identification Testimony
         (Docket No. 49)

     Testimony and evidence was adduced on the defendant's

motions to suppress at hearings before the undersigned on December

6 and 7, 2010, and January 21, 2011.  Written transcripts of the

hearings were prepared and filed with the court.  (See Docket No.

84, Transcript of December 6, 2010, Hearing; Docket No. 85,

Transcript of December 7, 2010, Hearing; and Docket No. 88,

Transcript of January 21, 2011, Hearing.)  Following the filing of

the hearing transcripts the parties were permitted to file

supplemental memoranda relating to the defendant's motions to suppress.

There are certain general principles of law (General Principles) which apply to an analysis of the issues raised in defendant's Motion To Suppress Evidence and Statements as it relates to the numerous events and occurrences which give rise to the motion. In order to avoid needless repetition, those General Principles are set out here in some detail and will be referred to, but not repeated, as appropriate in the discussion of individual events and occurrences.

For the purposes of this report, the particular law enforcement actions that are the subject of the defendant's motions will be identified by the date of the occurrence. Thereafter follow the factual findings of the undersigned as to that particular occurrence and a discussion of the principles of law applicable to the issues presented as to that occurrence in the defendant's motions and supplemental post-hearing memoranda.

## General Principles

1. <u>Encounters between citizens and law enforcement officials</u>

Supreme Court jurisprudence has placed police-citizen encounters into three tiers or categories: First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the Fourth Amendment. Second, there are the so-called <u>Terry</u>-type stops. These are brief, minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be

supported by a reasonable suspicion of criminal activity. Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987).

A.    Consensual Encounter

Law enforcement officers may approach an individual in a public place and ask questions of the person if they are willing to listen.    Florida v. Royer, 460 U.S. 491, 497 (1983).    Such encounters do not infringe upon any Fourth Amendment rights. Florida v. Rodriquez, 469 U.S. 1, 5 (1984); United States v. Drayton, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable searches and seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.") "Mere police questioning does not constitute a seizure."    Florida v. Bostick, 501 U.S. 429, 434 (1991). Voluntary answers to police questions during a consensual encounter are admissible in evidence in a criminal prosecution.    A consensual encounter may become a seizure of the person implicating the Fourth Amendment if by means of physical force or show of authority the person's freedom of movement is restrained to the extent that, considering the totality of the circumstances, a reasonable person would have believed that he was not free to leave.    United States v. Mendenhall, 446 U.S. 544, 554 (1980); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).

B.     Investigative Detentions

Law enforcement officers may detain an individual for a brief period of time if they have reasonable suspicion that criminal activity is afoot.  Terry v. Ohio, 392 U.S. 1, 30 (1968). Adams v. Williams, 407 U.S. 143, 145-46 (1972).

In order to detain a person in such circumstances an officer must have a "particularized and objective basis" for suspecting criminal activity.  United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004).  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances."  United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005), cert. denied, 546 U.S. 1177 (2006). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal objective justification for an investigatory [detention]."  United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004).  The process by which police officers may arrive at such a conclusion was described by the Supreme Court in United States v. Cortez, 449 U.S. 411, 418 (1981):

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.  First, the assessment must be based upon all of the circumstances.  The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or

patterns of operation of certain kinds of
lawbreakers. From these data, a trained officer
draws inferences and makes deductions – inferences
and deductions that might well elude an untrained
person.

The process does not deal with hard certainties,
but with probabilities. Long before the law of
probabilities was articulated as such, practical
people formulated certain common-sense conclusions
about human behavior; jurors as factfinders are
permitted to do the same – and so are law
enforcement officers. Finally, the evidence thus
collected must be seen and weighed not in terms of
library analysis by scholars, but as understood by
those versed in the field of law enforcement.

The second element contained in the idea that an
assessment of the whole picture must yield a
particularized suspicion is the concept that the
process just described must raise a suspicion that
the particular individual being stopped is engaged
in wrongdoing.

The observations of, and information available to, the officers may

concern matters that are in and of themselves wholly lawful, Terry

v. Ohio, 392 U.S. at 27-28, but when considered together justify

some further investigation. Id. at 22. United States v. Barker,

437 F.3d 787, 790 (8th Cir. 2006). During an investigative stop

police officer may take such steps as are reasonably necessary to

protect their personal safety and to maintain the status quo.

United States v. Hensley, 469 U.S. 221, 235 (1985). The police

officer may conduct a pat down search of the suspect if the officer

has a reasonable, articulable suspicion that the suspect may be

armed. Terry, 392 U.S. at 30; United States v. Banks, 553 F.3d

1101, 1105 (8th Cir. 2009).

C.    <u>Arrests</u>

Law enforcement officers may arrest a person if acting in good faith belief on the validity of an existing warrant for the arrest of that person.  <u>United States v. Teitloff</u>, 55 F.3d 391, 393 (8th Cir. 1995).  While there is a judicial preference for arrests based on a finding of probable cause made by a judicial officer prior to the arrest there is no constitutional requirement that a warrant be obtained before an arrest can be made.  <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975).  Police officers may arrest an individual without a warrant if

> at the moment the arrest was made, the officers had probable cause to make it – whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person arrested] had committed or was committing an offense.

<u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964).

Probable cause is a "fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules."  <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).  Police officers are not required to have enough evidence to justify a conviction in order to make a warrantless arrest.  <u>United States v. Caves</u>, 890 F.2d 87, 93 (8th Cir. 1989).  "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969).  Based on

their law enforcement training and experience police officers may draw reasonable inferences of criminal activity from circumstances which might seem merely innocuous to others not so trained and experienced. United States v. Wajda, 810 F.2d 754, 758 (8th Cir. 1987). In determining whether probable cause for a warrantless arrest existed in a particular case the court must consider the totality of the circumstances, including all of the information collectively known to the officers involved in the investigation. United States v. Bubis, 744 F.2d 61, 64 (8th Cir. 1984).

    2.   Searches and Seizures of Evidence

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and requires that warrants to search and seize be supported by probable cause. U.S. Const. amend. IV. Searches and seizures conducted without a warrant are deemed per se unreasonable unless they fall within certain well recognized exceptions to the warrant requirement. Katz v. United States, 389 U.S. 347, 357 (1967).

    A.   Standing

In order to challenge the admissibility of evidence on the ground that it was unlawfully obtained a defendant must show standing to complain of the activity, that is, he must show that he had a subjective and reasonable expectation of privacy in the area searched or the evidence seized. United States v. Salvucci, 448 U.S. 83, 86-87 (1980); Minnesota v. Carter, 525 U.S. 83 (1998).

The burden is upon the defendant to show that he has a reasonable expectation of privacy in the area searched. <u>Rakas v. Illinois</u>, 439 U.S. 128, 130-31 n. 1 (1978); <u>United States v. Marquez</u>, 605 F.3d 604, 609 (8th Cir. 2010) ("To establish a Fourth Amendment violation, a defendant must show that he had a reasonable expectation of privacy in the area searched.")

    B.    <u>Abandoned Property</u>

A defendant has no reasonable expectation of privacy in property which he has voluntarily abandoned and the search and seizure of abandoned property does not violate the defendant's Fourth Amendment rights. <u>Abel v. United States</u>, 362 U.S. 217 (1960); <u>California v. Hodari D.</u>, 499 U.S. 621, 629 (1991); <u>United States v. Simpson</u>, 439 F.3d 490, 494 (8th Cir. 2006).

    C.    <u>Search Warrants</u>

Search warrants to be valid must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched. <u>Johnson v. United States</u>, 333 U.S. 10 (1948); <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); Rule 41, Federal Rules of Criminal Procedure. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions. "In dealing with probable cause, . . . as the very name implies, we deal with

probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>Brinegar v. United States</u>, 338 U.S. 160, 176 (1949). Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion. <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965). Probable cause may be found in hearsay statements from reliable persons, <u>Gates</u>, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, <u>McDonald v. United States</u>, 335 U.S. 451, 454 (1948). Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. <u>Gates</u>, 462 U.S. at 230. Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding. <u>Gates</u>, 462 U.S. at 236.

    D.   <u>Warrantless Searches</u>

    Although searches without warrants are deemed <u>per</u> <u>se</u> unreasonable under the Fourth Amendment there are certain well

recognized exceptions to the warrant requirement and searches conducted and evidence seized pursuant to those exceptions are considered lawful.

(i) <u>Search Incident To Arrest</u>

When law enforcement officials make a lawful arrest of a person they may conduct a full search of that person for both weapons and evidence. <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973); <u>United States v. Johnson</u>, 445 F.3d 793, 795 (8th Cir. 2006). They may also search items or areas within the arrestee's immediate control. <u>Chimel v. California</u>, 395 U.S. 752, 753 (1969); <u>United States v. Lucas</u>, 898 F.2d 606, 609-610 (8th Cir. 1990).

(ii) <u>Items in Plain View</u>

When police officers are lawfully in a place and observe items in plain view which they have probable cause to believe are contraband or evidence of a crime, they may seize such items without a warrant. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443 (1971); <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987).

(iii) <u>Consent</u>

Persons may give up their Fourth Amendment rights by consenting to a search. <u>Schneckloth v. Bustamonte</u>, 412 U.S. v. 218 (1973). Such consent must be given freely and voluntarily. <u>Id.</u> In determining whether consent to search was given freely and voluntarily, the Court must examine the totality of the circumstances under which it is given. <u>United States v.</u>

<u>Mendenhall</u>, 446 U.S. 544 (1980).  Consent to search may be given by the suspect or by some other person who has common authority over the premises or item to be searched.  <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974).  A search may be valid when based on the consent of a party whom the police reasonably believe to have authority to consent to the search even if it is later determined that the party did not in fact have such authority.  <u>Illinois v. Rodriquez</u>, 497 U.S. 177, 186 (1990).

    (iv) <u>Automobile Searches</u>

      Police may search an automobile or other vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or evidence.  <u>Carroll v. United States</u>, 267 U.S. 132 (1925); <u>Chambers v. Maroney</u>, 399 U.S. 42 (1970).  In such circumstances, the officers may search the entire vehicle, including the trunk area, and any items or containers found in the vehicle.  <u>United States v. Ross</u>, 456 U.S. 798 (1982).  When officers have probable cause to search a container which is contained within a vehicle, they may search that container without a warrant, even if there is no probable cause to search the entire vehicle itself.  <u>California v. Acevedo</u>, 500 U.S. 565, 579-580 (1991).

    3.   <u>Interviews and Statements of Defendants</u>

      In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) the Supreme Court held that before questioning a person in custody law

enforcement officials must advise the person that he has the right to remain silent; that any statements he makes may be used against him at trial; that he has the right to have an attorney present during questioning; and that if he cannot afford an attorney one will be appointed for him. <u>Id.</u> at 478-79. The officials may question the person after so advising him if the person voluntarily, knowingly and intelligently waives these rights and agrees to answer questions put to him by the officials. Absent such advice and waiver, statements obtained through interrogation of a person in custody are not admissible against the person at trial. <u>Id.</u> at 479.

The proscriptions of <u>Miranda</u> apply only when the person questioned is "in custody" and subject to "interrogation" by law enforcement officials. <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990). A person is in custody within the meaning of <u>Miranda</u> when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" <u>Berkemer v. McCarthy</u>, 468 U.S. 420, 440 (1984); <u>California v. Beheler</u>, 436 U.S. 1121, 1125 (1983). "Interrogation" within the meaning of <u>Miranda</u> is "express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of interrogation are "words or actions on the part of [law enforcement officers] . . . that the [law enforcement officers] should know are reasonably likely to elicit

an incriminating response from the suspect." Id. at 301. Miranda does not apply if the person is not in custody, even if the person is suspected of criminal activity or is a focus of the investigation. Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Beckwith v. United States, 425 U.S. 341, 345 (1976). A person is not considered to be in custody within the meaning of Miranda during ordinary traffic stops, Berkemer v. McCarty, 468 U.S. 420 (1984); or during investigative stops conducted on reasonable suspicion, United States v. Pelayo-Ruellas, 345 F.3d 589, 592 (8th Cir. 2003).

    4.  Identification Testimony

        A defendant's constitutional right to due process may be violated by pretrial confrontation procedures that are unnecessarily suggestive and conducive to an irreparable mistaken identification. Stovall v. Denno, 388 U.S. 293 (1967). Because it is the likelihood of misidentification that violates the right to due process, the Court's inquiry must necessarily focus on the reliability of the identification. Neil v. Biggers, 409 U.S. 188, 198 (1972).

        Any analysis of such identification testimony must necessarily involve a two-step approach. First, the Court must determine whether the identification procedures used were unduly suggestive. Second, if the procedures used were unduly suggestive, the Court must then look to the totality of the circumstances to

determine whether the identification testimony is nevertheless reliable. <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977). <u>See</u> <u>also</u> <u>Neil v. Biggers</u>, <u>supra</u>. In determining whether the identification is reliable, the Court may look to such factors as the witness' opportunity to view the defendant, the witness' degree of attention, the accuracy of any prior description given by the witness, the witness' level of certainty in his or her identification and the length of time between the occurrence described and the confrontation. <u>See</u> <u>Manson v. Brathwaite</u>, 432 U.S. at 114. The identification testimony may be admitted if the reliability of the identification judged by the above factors outweighs the effect of any undue suggestion. <u>Id.</u>

<u>Findings Of Fact And Conclusions Of Law</u>

From the evidence adduced at the motion hearings the undersigned makes the following findings of fact and conclusions of law.

<u>Events of February 21, 2001</u> (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 6-17)

<u>Findings of Fact</u>

On February 21, 2001, at about 10:00 a.m., Officer Edward Slade of the St. Louis Metropolitan Police Department was on patrol in the 4300 block of Maffitt Avenue, in the City of St. Louis, Missouri. At that time Officer Slade noticed a vehicle being driven on the street that had no license plate displayed. Officer

-14-

Slade stopped the vehicle using his patrol car lights and siren.

After stopping the vehicle Officer Slade approached the driver's side of the vehicle. He then spoke with the driver who identified himself as Lamont Turner. Officer Slade asked Turner to produce his driver/operator's license. Turner responded that he did not have one on his person. Turner also told Officer Slade that he had recently purchased the vehicle as an explanation as to why there were no license plates on the vehicle.

As Officer Slade spoke with Turner he noticed the odor of marijuana coming from inside the vehicle. Officer Slade also saw that an individual, later identified as Jamaal Curry Johnson, the defendant here, was seated in the front passenger seat of the vehicle. Johnson had his hands together as if holding an object.

Officer Slade placed Lamont Turner under arrest on various outstanding warrants for his arrest. He asked Turner for permission to search the vehicle and Turner agreed.

Officer Slade went to the passenger side of the vehicle. As he was approaching he saw Jamaal Johnson move his right hand to the area between the seat of the car and the door. Officer Slade asked Johnson to roll down the window. Johnson instead stepped out of the vehicle. Officer Slade then searched the vehicle. Inside a pocket area on the inside front passenger door Officer Slade located and seized four individual plastic bags each of which contained a substance which appeared to Officer Slade to be

marijuana.  Officer Slade then placed Johnson under arrest for possession of a controlled substance.  In a subsequent search of Johnson Officer Slade found and seized $169.00 in currency.

The vehicle was also seized for possible forfeiture proceedings.

Discussion

In his post hearing memorandum the defendant asserts as grounds to suppress the evidence seized that the search of the vehicle in which he was riding "was an unlawful and warrantless search without any exception to the Fourth Amendment doctrine of exclusionary rule (sic)."  The search of the vehicle was lawful because made with the consent of Lamont Turner the apparent owner and operator of the vehicle.  See General Principles, § 2.D(iii); United States v. Morales, 861 F.2d 396, 399 (3rd Cir. 1988) (Driver has authority to consent to search of vehicle).  Further, as Officer Slade spoke with Turner while Turner was seated in the stopped vehicle Officer Slade could smell the odor of marijuana emanating from the vehicle.  This provided probable cause for the search of the vehicle.  See United States v. Caves, 890 F.2d 87, 90-91 (8th Cir. 1989) and cases cited therein; United States v. Brown, 634 F.3d 435, 438 (8th Cir. 2011).

The defendant also asserts that his arrest was unlawful because made without a warrant and without probable cause.  He further claims that the subsequent search of his person and seizure

of currency found on his person were unlawful. When Officer Slade first stopped the vehicle he noticed that the defendant, who was seated in the front passenger seat of the vehicle, had his hands together as if holding an object. As the officer moved to the passenger side of the vehicle he saw the defendant move his right hand to the area between the seat of the car and the door. After the defendant got out of the car Officer Slade found four individual plastic bags containing marijuana in a pocket area on the inside front passenger door. These items found in close proximity to the area where the defendant had been seated, and in the area to which the defendant had reached upon Officer Slade's approach to the passenger side of the vehicle provided probable cause for Officer Slade to believe that the defendant possessed the marijuana found in the door pocket, and therefore probable cause for the arrest of the defendant. See General Principles, § 1.C; R.S.Mo. § 195.202. The subsequent search of the defendant in which money was found on his person was a lawful search incident to the lawful arrest of the defendant. See General Principles, § 2.D(i).

Events of April 10, 2001 (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 17-26)

Findings of Fact

On April 10, 2001, officers of the St. Louis Metropolitan Police Department sought and obtained a warrant to search a residence located at 4356 Maffitt Avenue in the City of St. Louis,

Missouri.[1]  On April 11, 2001, officers went to that location for
the purpose of executing the warrant.  Upon arrival the officers
knocked on the door of the residence, announced that they were
police officers and had a warrant to search the residence.  No one
answered the door.  The officers could hear people moving about in
the residence.  Fearing that evidence might be destroyed the
officers then broke open the door and entered the residence.
Several individuals were located in the living room area.

Officer Daniel Early went to the basement area of the
residence.  When Officer Early went to the basement he saw an
individual, later identified as Jamaal Curry Johnson, the defendant
here, standing in front of a television set.  Johnson was stuffing
plastic bags containing what appeared to Officer Early to be
marijuana into a slot in a VCR sitting on top of the television.
Officer Early seized what turned out to be six individual bags of
marijuana from the VCR.  Officer Early then placed Johnson under
arrest.  He then searched Johnson's person and found and seized
eight additional bags of marijuana and a hand rolled cigar.

Discussion

At the motion hearing Officer Early testified that the
search of the residence at 4356 Maffitt was made pursuant to a

---

[1]As of the date of the hearing on the defendant's motions the
government had been unable to locate a copy of the application or
search warrant and therefore those documents are not in evidence
before the court.

search warrant.  However, the government was unable to produce the warrant at the hearing.  In his post-hearing memorandum the defendant asserts that because the government did not produce the search warrant at the hearing the court must presume that the entry into the residence was a warrantless search and that the officers were not lawfully on the premises and that, therefore, the seizure of evidence in the residence was unlawful.

The undersigned notes that, as a threshold matter, a defendant seeking to suppress evidence seized in violation of the Fourth Amendment has the burden of showing that he has standing to do so.  See General Principles, § 2.A.  Nothing in the evidence adduced before the court shows that the defendant was an owner of, a resident of, or an invited guest in the residence.  All that is shown by the evidence is that the defendant was present in the residence at the time the search warrant was executed.  This is not a sufficient showing by the defendant to permit him to assert a violation of his Fourth Amendment rights by the entry into the residence by the officers.  United States v. Smith, 783 F.2d 648 (6th Cir. 1986); United States v. Ramires, 307 F.3d 713, 715-16 (8th Cir. 2002) cert. denied, 538 U.S. 1006 (2003); United States v. Mitchell, 64 F.3d 1105, 1109-10 (7th Cir. 1995) cert. denied, 517 U.S. 1158 (1996).

Once inside the residence Officer Early saw the defendant stuffing bags of what appeared to Officer Early to be marijuana.

Officer Early seized the marijuana.  These items were in plain view of Officer Early and were therefore lawfully seized.  <u>See</u> General Principles, § 2.D(ii).

Officer Early then arrested the defendant and searched his person.  In the search of the defendant's person Officer Early found and seized additional marijuana and a hand-rolled cigar.  The search, and seizure of items from, the defendant's person were lawful because made incident to the lawful arrest of the defendant.  <u>See</u> General Principles, § 2.D(i).

<u>Events of September 5, 2001</u> (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 26-37)

<u>Findings of Fact</u>

On September 5, 2001, Officers Mike Mathews and John Blaskiewicz, of the St. Louis Metropolitan Police Department were on patrol driving eastbound in the 4400 block of Maffitt Avenue in the City of St. Louis, Missouri.  As they drove they noticed a man walking eastbound on the south side of the street.  Officer Mathews could see that the man had the fist of his right hand clenched.  When the officers got to about 30 feet away from the person Officer Mathews saw the man open his hand and drop something to the ground in the grassy area next to the sidewalk.  Based on his training and experience Officer Mathews thought the person might have discarded drugs that he was carrying.  The officers then stopped and got out of their vehicle.  Officer Mathews detained the man while Officer

Blaskiewicz went to the area where the object was dropped. In that area, Officer Blaskiewicz found and seized three individually wrapped plastic bags containing what appeared to the officers to be crack cocaine. The person, who was identified as Jamaal Curry Johnson, the defendant here, was placed under arrest.

<u>Discussion</u>

As grounds to suppress the evidence seized by the officers the defendant asserts in his post-hearing memorandum that the officers had no reasonable suspicion that he was engaged in criminal activity, and thus no reason to detain him.

The evidence shows that the officers observed the defendant walking on the street while they were riding in their patrol car. As they neared the defendant he dropped an object from his hand. Only after seeing the defendant discard the item from his hand did they stop, get out of their vehicle and detain the defendant. The defendant had abandoned the crack cocaine that was seized by the officers. <u>See</u> General Principles, § 2.B. Moreover, the abandonment occurred before there was any seizure of the defendant within the meaning of the Fourth Amendment. <u>See</u> <u>California v. Hodari D.</u>, 499 U.S. at 629.

Further, the stop of the defendant was lawful. Officer Matthews testified that based on his training and experience he believed that the defendant might have discarded drugs when he dropped the item from his hand. In the totality of the

circumstances it was reasonable for Officer Mathews to briefly detain the defendant while the other officer retrieved the abandoned package so that the suspicion that the defendant had discarded drugs could be confirmed or dispelled. <u>See</u> General Principles, § 1.B.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to shrug his shoulders and to allow a crime to occur or a criminal to escape. On the contrary, <u>Terry</u> recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to . . . maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

<u>Adams v. Williams</u>, 407 U.S. 143, 145-46 (1972)(internal citations omitted).

This is precisely what the officers did in this case.


<u>Events of October 6, 2001</u> (Transcript of Hearing December 6, 2010, Docket No. 84, Pp. 38-60)

<u>Findings of Fact</u>

In the evening hours of October 6, 2001, at about 8:50 p.m., Officer Dae Lederle of the St. Ann, Missouri, Police Department was on patrol at the Northwest Plaza shopping center in St. Ann, Missouri. While on patrol he noticed a white Oldsmobile Cutlass automobile. The vehicle was driving in the parking area of the shopping plaza and on the adjacent outer road. The headlights

and taillights of the Oldsmobile Cutlass were not illuminated. Officer Lederle made a traffic stop of the vehicle using the emergency lights on his police patrol car. Officer Lederle then spoke to the driver of the Oldsmobile asking for the driver to produce his driver/operator's license and proof of insurance document. The driver identified himself as Edward Charles Williams. The driver said that he had a valid operator's license but did not have it on his person at that time. Officer Lederle then ran a computer check using the name and date of birth given to him by the driver. The dispatcher advised Officer Lederle that the check found no operator's license in the name and date of birth provided by the driver.

Officer Lederle then placed the driver under arrest for operating a motor vehicle without a license. Officer Lederle then inquired of the suspect whether the name he gave to Officer Lederle was his true name. The driver replied that it was not, and that his true name was Jamaal Curry Johnson. Officer Lederle then ran a computer check using that name and the true date of birth provided by Johnson. The computer check revealed that Johnson did not have an operator's license, but only a driving permit, and that there were warrants of arrest outstanding for Johnson issued in the City of St. Louis, Missouri.

Officer Lederle then transported Johnson to the St. Ann City Jail where he was booked into the jail. During the booking

process the defendant was ordered to remove items of his clothing and to change into jail issued clothing. He was asked to remove his shoes and when he did so the processing officer, Officer Lewis Helton, saw a plastic baggie corner fall from Johnson's right shoe. The baggie contained an off white substance which appeared to Officer Helton to be a controlled substance. Officer Helton immediately contacted Officer Lederle who came to the area and seized the baggie and its contents. Officer Lederle then packaged the item as evidence to be sent to the crime lab for analysis.

Discussion

As grounds to suppress evidence seized on October 6, 2001, the defendant first asserts in his post-hearing memorandum of law that the stop and arrest of the defendant were pretextual and therefore unlawful. Officer Lederle testified that he stopped the vehicle which defendant was driving because it was dark and the headlights and taillights were not illuminated. It is a violation of Missouri state law to operate a motor vehicle on the roadways in hours of darkness without the lamps of the vehicle being illuminated. R.S.Mo. § 307,020. "An officer who observes a violation of law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008); Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977). During a lawful traffic stop an officer may ask to see the driver's license and vehicle

registration.  United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005).  The officer may run a check of the license and registration.  United States v. $404,905.00 In U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999).  When asked by Officer Lederle to produce his driver's license the defendant, who had given a false name, said that he had a valid license but did not have it on his person.  Officer Lederle then ran a license check using the false name that the defendant had given to him.  The check showed that there was no valid operator's license on file for a person with that name.  It is a violation of Missouri state law to operate a motor vehicle without a valid operator's license.  R.S.Mo. § 302.020.1(1).  The offense is a Class A Misdemeanor.  Id. at § (3). Officer Lederle then placed the defendant under arrest for this violation.  The arrest of the defendant was lawful because officers may arrest a person for offenses committed by the person in their presence, including misdemeanor offenses.  United States v. Watson, 423 U.S. 411, 418 (1976); Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); Virginia v. Moore, 553 U.S. 164, 171-76 (2008). The defendant then admitted to Officer Lederle that the name he had given was false, and that his true name was Jamaal Johnson. Officer Lederle then ran a license check under defendant's true name and learned that the defendant did not have a valid operator's license in his true name.  Officer Lederle also learned that there were outstanding warrants for the arrest of the defendant.  The

defendant claims that the stop and subsequent arrest of the defendant were pretextual, that is, the officer had other motives to stop the defendant. The subjective intentions of the officer are irrelevant because probable cause objectively existed for the stop and subsequent arrest of the defendant. Whren v. United States, 517 U.S. 806, 811-13 (1996); "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813. United States v. Stachowiak, 521 F.3d 852, 855 (8th Cir. 2008); Arkansas v. Sullivan, 532 U.S. 769, 772 (2001).

Officer Lederle then transported the defendant to the jail facility to be booked and processed. During the booking process he was asked to remove his clothing and to change to jail issued clothing. As the defendant was doing so a baggie containing what appeared to be a controlled substance fell from his shoe. The baggie was then seized. The defendant contends that this "strip search" of the defendant at the jail was unlawful. Upon making a lawful arrest of a person, officers may lawfully conduct a full search of that person incident to the arrest. See General Principles, § 2.D.(i). In the United States v. Edwards, 415 U.S. 800, 815 (1974) the Supreme court held that a search incident to arrest may take place after the arrestee has been transported to a place of detention. This is so even though officers may have conducted a brief pat down search at the original time and place of arrest. United States v. Swofford, 529 F.2d 119, 122 (8th Cir.

1976); <u>United States v. Ruigomez</u>, 702 F.2d 61, 66 (5th Cir. 1983).

The case cited by the defendant in support of his position, <u>United States v. Hatcher</u>, 275 F.3d 689 (8th Cir. 2001) is inapposite. The court's holding in that case was premised on the district court finding that the jailhouse search followed an <u>unlawful</u> <u>arrest</u> and therefore could not be considered as a lawful search incident to a lawful arrest. <u>Id.</u> at 691.

When the baggie fell from the defendant's shoe it was then in plain view of the officers and was lawfully seized. <u>See</u> General Principles, § 2.D.(ii)

<u>Events of August 9, 2002</u> (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 60-74)

<u>Findings of Fact</u>

On August 9, 2002, Officers Steve Schwerb and Nick Sloan of the St. Louis Metropolitan Police Department were assigned to investigate a citizen complaint that drug activity was taking place at 4422 Maffitt Avenue, St. Louis, Missouri. The officers went to that location, an apartment building, and took up surveillance in their unmarked police car across the street from the building. While on surveillance they saw Jamaal Curry Johnson, the defendant here, standing in front of the building at 4422 Maffitt Avenue. Officer Schwerb recognized Johnson from previous contacts. While on surveillance the officers observed several instances in which persons on foot would approach Johnson and hand him currency.

Johnson in turn would remove an object from his pocket and would hand it to the person who had given him currency.

After observing a number of these transactions the officers got out of their police car and approached Johnson. After verifying Johnson's identity and obtaining his birth date the officers ran a computer check and learned that there were several outstanding warrants for the arrest of Johnson issued in the City of St. Louis. The officers then placed Johnson under arrest and conducted a search of his person. They found and seized nine individually wrapped bags of marijuana and $164.00 in currency from Johnson's person.

<u>Discussion</u>

As grounds to suppress the evidence seized the defendant asserts in his post-hearing memorandum that the officers had no reasonable suspicion to detain and question him. In the first instance, the defendant challenges the testimony of the officer, claiming that it was unlikely that he could observe the event in the detail described. The undersigned, having had the opportunity to see and hear the testimony of the officer, and to consider matters reflecting on his credibility, does find the testimony of Officer Schwerb credible.

The officers were assigned to investigate a citizen complaint of drug activity at a particular location. They went to that location and took up surveillance. Upon doing so they

observed a person, identified as the defendant Jamaal Johnson, to engage in a number of transactions wherein persons would approach Johnson and hand him currency, and Johnson would in turn hand something back to the person. Based on the totality of these circumstances Officer Schwerb could reasonably believe that the defendant was engaged in drug transactions, and he could therefore approach and briefly detain the suspect for further investigation. See General Principles, § 1.B.

During the encounter the officers ran a record check and learned that there were outstanding warrants for the arrest of the defendant. They then placed him under arrest and searched his person. On his person they found and seized numerous packets of marijuana and currency. The search of defendant's person and seizure of evidence found on his person was made and done incident to the lawful arrest of the defendant and was therefore lawful. See General Principles, § 2.D.(i).

Events of February 16, 2004 (Transcript of Hearing, December 6, 2010, Docket No. 84 Pp. 74-91)

Findings of Fact

On February 16, 2004, at about 11:00 a.m., Officers Craig Robertson and Robert Stern of the St. Louis Metropolitan Police Department were on routine patrol in the 4400 block of Maffitt Avenue in the City of St. Louis, Missouri. As they were driving in the 4400 block of Maffitt Avenue they observed a man, later

identified as Jamaal Curry Johnson, the defendant here, standing in the 4300 block of Maffitt Avenue. They saw Johnson flag down a passing car, a gray colored Oldsmobile. The car stopped in the street and Johnson approached the driver's side. The officers decided to park their vehicle and observe Johnson because they knew from training and experience that drug transactions are sometimes conducted in such a manner.

As they observed, the officers saw Johnson engage in conversation with the driver of the Oldsmobile. Johnson then reached into his pants pocket, took out an object and handed it to the driver of the Oldsmobile. The driver of the Oldsmobile then appeared to hand an object to Johnson, which Johnson then placed in his pocket. During the time that the Oldsmobile was parked in the street several vehicles had to drive around the Oldsmobile to pass it and proceed down the street.

Believing that they had witnessed a drug transaction, and because the Oldsmobile and Johnson standing in the street were impeding the flow of traffic, an ordinance violation, the officers decided to approach Johnson to issue a summons for the ordinance violation and to further investigate regarding their observations. As they drove their police vehicle toward the Oldsmobile it sped off.

Johnson ran as the police car approached. Officer Stern got out of the police car and began pursuing Johnson on foot.

Officer Robertson stayed in the police car and drove to an area where he thought he could catch up with Johnson. Officer Robertson got out of the police car at 4408 Maffitt Avenue and went into a gangway of the residence at that location. As Officer Robertson approached Johnson from one direction, and Officer Stern from the other, the defendant attempted to flee by breaking down a fence in the yard. The officers were then able to apprehend the defendant. They placed him under arrest for destruction of private property (the fence) and street demonstration (for his role in impeding the flow of traffic). Officer Stern then searched Johnson's person and found and seized from his pants pocket plastic bags containing what appeared to be crack cocaine and marijuana. A quantity of currency was also found and seized from Johnson's person.

Discussion

As grounds to suppress the evidence seized the defendant asserts that the stated grounds for his arrest - street demonstration - was pretextual and that the officers had no grounds for reasonable suspicion to detain him or probable cause to arrest him.

A police officer may lawfully arrest a person for an offense committed by the person in the officer's presence. United States v. Watson, 423 U.S. 411, 418 (1976). Missouri state law permits an officer to arrest a person for ordinance violations. R.S.Mo § 479.110. "If an officer has probable cause to believe

that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001) (Full custodial arrest for offense of riding in a vehicle while not wearing a seat belt, a misdemeanor punishable only by fine). The officers had probable cause to arrest the defendant for the ordinance violation of street demonstration by impeding the flow of traffic.[2]

The defendant contends that the arrest of the defendant for an ordinance violation was pretextual and that the officers had other motives in arresting the defendant. In <u>Whren v. United States</u>, 517 U.S. 806 (1996) the Supreme Court held a traffic stop lawful because based on probable cause, even though the officer stopping the vehicle may have suspicions of this unlawful activity. In so holding the court stated "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." <u>Id.</u> at 813. In <u>Arkansas v. Sullivan</u>, 532 U.S. 769 (2001) the Supreme Court applied that same reasoning to a custodial arrest made on probable cause. <u>Id.</u> at 772.

---

[2]The defendant fled upon approach of the officers. It is a crime under the laws of the State of Missouri to resist arrest by fleeing from an officer who is attempting a lawful arrest or detention of a suspect for any offense, including ordinance violations. R.S.Mo. § 575.150. The officers had probable cause to arrest the defendant for this offense as well once he fled from them.

The items found on the defendant's person and seized therefrom were found and seized in a search incident to the lawful arrest of the defendant. The search and seizure was therefore lawful. <u>See</u> General Principles, § 2.D(i).

<u>Events of February 20, 2004</u> (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 91-118)

<u>Findings of Fact</u>

On February 19, 2004, Officers Keith Hicks and Dan Disterhaupt were assigned to investigate a citizen complaint that drugs were being sold on the street at 4308 Maffitt Avenue in the City of St. Louis, Missouri. The citizen also reported that gunshots were sometimes exchanged between competing factions of drug dealers. The officers went to that area in an unmarked car and took up surveillance. They saw a number of persons standing in front of an apartment building at 4308 Maffitt Avenue. The officers parked their vehicle where they would have a view of the area. They then observed a number of vehicles pull up to the front of 4308 Maffitt and engage in transactions with persons who were standing in the yard or on the sidewalk at the apartment building. Based on their observations and training and experience the officers believed that they had observed drug transactions.

The officers then left the area. Officer Hicks then met with a superior officer and made arrangements to conduct further surveillance at the 4308 Maffitt Avenue location on the following

day with the assistance of additional fellow officers. A plan was devised where officers would surround and approach the apartment building from different directions.

On February 20, 2004, Officer Hicks, accompanied by other officers, returned to the area of 4308 Maffitt Avenue. At about 3:45 p.m. Officer Hicks began surveillance of the area. He saw four people standing on the sidewalk in front of the apartment building at 4308 Maffitt Avenue. As he conducted surveillance Officer Hicks observed a number of vehicles drive up to the area and engage in transactions with three of the four people standing in front of the building. The fourth person, later identified as Jamaal Curry Johnson, the defendant here was not seen by the officers to engage in any transactions.

After observing these occurrences the officers decided to approach the persons standing on the sidewalk. The officers converged on the area. Officer Wendell Ishmon and his partner drove up to the front of 4308 Maffitt Avenue. The officers were in an unmarked car. Officer Ishmon was wearing a jacket marked "Police". As he got out of the police car Officer Ishmon saw Johnson drop a plastic bag to the ground and then walk away. Officer Ishmon retrieved the plastic bag and saw that it contained what appeared to be a quantity of marijuana. The other three persons were all found also to be in possession of marijuana. All four, including Johnson, were arrested.

<u>Discussion</u>

As grounds to suppress the evidence seized the defendant asserts in his post-hearing memorandum of law that the officers had neither reasonable suspicion to detain the defendant nor probable cause to arrest him.

The officers approached the defendant as he stood in front of 4308 Maffitt. When the officers arrived and got out of their car Officer Ishmon saw the defendant drop a plastic bag to the ground and then walk away. Officer Ishmon retrieved the bag and saw that it contained what appeared to be marijuana. The defendant abandoned the bag of marijuana when he dropped it to the ground and the subsequent seizure of the bag by Officer Ishmon was lawful. <u>See</u> General Principles, § 2.B. The arrest of the defendant was lawful because made upon probable cause. <u>See</u> General Principles, § 1.C. Officer Ishmon had probable cause to believe that the defendant possessed marijuana based on his observations. <u>See</u> <u>United States v. Watson</u>, 423 U.S. 411, 418 n.6 (1976); <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001); R.S.Mo. § 195.202.

<u>Events of April 6, 2004</u> (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 112-118)

<u>Findings of Fact</u>

Although listed in the government's disclosure notice of matters potentially subject of the defendant's Motion To Suppress

Evidence, and mentioned in defendant's Motion To Suppress Evidence (Docket No. 43, p.4, ¶ 20), as the defendant notes in his post-hearing memorandum of law, and as the undersigned finds herein, no evidence was seized from the defendant during the occurrence on April 6, 2004.

Discussion

Because no evidence was seized from the defendant on April 6, 2004, there is no need for any further discussion of the matter for purposes of defendant's motion and this report and recommendation.

Events of May 11, 2004 and Subsequent Investigation (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 132-140; Transcript of Hearing, December 7, 2010, Docket No. 85, Pp. 7-11, Pp. 173-252)

Findings of Fact

In the early morning hours of May 11, 2004, three men were seated in a Buick Regal automobile parked near 3110 Fair Avenue in the City of St. Louis, Missouri. The three men were Travis Deal, Ronnell Coleman and Joseph Middendorf. Deal owned the automobile in which the men sat. The car was parked at the curb, with the driver's side of the vehicle curbside and the passenger side of the car streetside. Deal and Middendorf had been using heroin earlier that night. At about 1:00 a.m. a car pulled up in the street next to Deal's car and the occupants of the second car began shooting at the occupants of Deal's car.

Travis Deal testified as to his recollection of the events as follows.  He was seated in his vehicle when he saw a burgundy-colored four door Buick Regal automobile drive up and stop in the street adjacent to the passenger side of his vehicle.  He then heard shooting and the windows of his car "popped out."  Deal ducked down.  He then looked back up.  The area was lit by street lights and Deal was able to see the occupants of the car.  He saw three people in the burgundy Regal.  He recognized one of the people in the car as a person known to him as "Little Woodie".  Little Woodie was shooting at him with a gun.  He knew Little Woodie for several years from the neighborhood, and had purchased drugs from Little Woodie on Maffitt Avenue on several occasions.  Deal was grazed by a gunshot.  He then got out of his car and ran.  As he did so he saw Ronnell Coleman lying on the sidewalk wounded.  Coleman tried to get up but then fell back down.   Deal ran to Ronnell Coleman's house and placed a 911 call.   An ambulance responded to the scene and took Coleman and Deal to the hospital.  Coleman died of his wounds.

Joseph Middendorf testified as to his recollection of the events as follows.  He was seated in the car with Deal and Coleman.  He decided to get some rolling papers so that they could smoke marijuana.  He got out of the car and walked across the street.  As he was crossing the street he noticed a car speeding at him on Fair Avenue.  He hurried across the street so as not to be struck by the

car.  He then heard brakes screeching.  He looked over his shoulder.  The area was lit by streetlights and Middendorf was able to see.  He saw a burgundy colored car.  A person was hanging out of the back passenger area of the car holding a long gun.  Another person in the driver's seat of the car was holding a handgun.  Middendorf then heard shooting.  He ran up the steps onto the front porch of a house and began knocking on the door.  No one answered.  Middendorf then turned back around and yelled at the top of his voice "Stop it."  The person holding the long gun then turned and looked at him.  The man was about fifteen yards away.  Middendorf looked eye to eye with the man.  Middendorf was able to see that the man had gold teeth.  He was dark skinned and very thin.  The man pointed the gun at Middendorf.  Middendorf then jumped off of the porch and hid.  Middendorf then saw the car drive off on Fair Avenue and then make a right turn at the intersection with Labadie Street.

Travis Deal was interviewed by the police on the date of the incident.  He described what had occurred but did not tell the police that he had recognized one of the persons shooting at him.  Joseph Middendorf was interviewed by the police on the day of the incident.  He described what occurred and told the officers that he did not know any of the persons doing the shooting.

Officer Michael Grone, of the St. Louis Metropolitan Police Department Evidence Technician Unit responded to and

processed the scene of the shooting.  He photographed the area and gathered items of evidence.  (See Government's Motion Hearing Exhibits 1-16 - Photographs of scene).

Officers were able to locate the burgundy colored Buick automobile believed to be used in the shooting on May 11, 2004. Officer George Weindel of the St. Louis Metropolitan Police Department Evidence Technician Unit went to the location of that vehicle and processed the scene.  He took photographs and collected evidence.  (See Government's Motion Hearing Exhibits 18-24 - Photographs of scene).

Detective Matthias Hanewinkel, of the St. Louis Metropolitan Police Department Homicide Division was assigned to investigate the shooting incident at 3110 Fair and the death of Ronnell Coleman.  On May 12, 2004, Detective Hanewinkel was told by another officer that an anonymous tipster had reported that Brandon Gunn was responsible for the shooting of Coleman.  Detective Hanewinkel conducted an investigation and determined that Gunn was not involved in the shooting.  During the investigation Detective Hanewinkel interviewed Gunn.  Gunn told the Detective that Travis Deal told Gunn that persons known as Woodie and Baby Tracy were responsible for the shooting of Deal and Coleman.  Several days later Detective Hanewinkel's partner spoke by telephone with Deal about the information Gunn had provided concerning Deal's statements to Gunn.  Deal told the officer that he had heard on the

street that Little Woodie and Baby Tracy were the persons responsible for the shooting.

Detective Hanewinkel put together a group of ten photographs of persons known to him as "gangsters" in the neighborhood of the shooting. The group included photographs of Jamaal Johnson and Tracy Johnson. (See Government's Motion Hearing Exhibit 43). On July 9, 2004, Detective Hanewinkel was able to meet with Travis Deal. He showed the group of photographs (Exhibit 43) to Deal. Deal identified the photograph of Jamaal Johnson as a photo of the person known to him as Little Woodie. Deal identified the photograph of Tracy Johnson as a photograph of the person known to him as Baby Tracy. Again on this occasion Deal did not tell Detective Hanewinkel that Little Woodie/Jamaal Johnson was one of the persons shooting at him on May 11, 2004.

On February 8, 2006, Detective Hanewinkel was able to locate and interview Joseph Middendorf. During the interview Detective Hanewinkel displayed two sets of photographs to Middendorf and asked if he recognized anyone shown in the photographs. (See Government's Motion Hearing Exhibits 39 and 40). Middendorf indicated that he recognized the person shown in photo number 6 in Exhibit 39 as the person he saw in the rear passenger seat area of the burgundy Buick and who had pointed the long gun at him on May 11, 2004. Middendorf circled that photo and placed his initials on the photo. The person shown in the photo identified by

Middendorf is Jamaal Curry Johnson, the defendant here. Middendorf further indicated that he recognized the person shown in photo number 2 in Exhibit 40 as the man he saw driving the burgundy Buick on May 11, 2004. Middendorf circled that photo and placed his initials on the photo.

On the following day, February 9, 2006, Middendorf viewed a live lineup of five individuals. He was asked if he recognized anyone in the lineup. Middendorf identified the person standing in position number 3 in the lineup as a person involved in the shooting on May 11, 2004. The person standing in position number 3 in the lineup was Jamaal Johnson. (<u>See</u> Government's Motion Hearing Exhibit 41).

On March 26, 2006, Middendorf viewed a live lineup of four individuals. He was asked if he recognized anyone in the lineup. Middendorf indicted that he recognized the person standing in position number 3 in the lineup as a person who had been involved in the shooting on May 11, 2004. Tracy Johnson was standing in position number 2 in the lineup and was not then identified by Middendorf. (<u>See</u> Government's Motion Hearing Exhibit 42).

On October 29, 2009, Special Agent Joseph Frank of the Bureau of Alcohol, Tobacco and Firearms interviewed Travis Deal. Deal was then confined at the Pettis County Jail on pending charges. Deal was told through his attorney that if he agreed to

cooperate with investigators in their investigation of the events of May 11, 2004, that his cooperation would be made known to the prosecutor on the pending charges. Deal agreed to so cooperate. In the interview on October 29, 2009, Deal was asked to view a set of six photographs and to say whether he recognized anyone in the photographs as anyone involved in the May 11, 2004, incident. Deal indicated that he recognized the person shown in photo number 4 as being one of the persons involved in the shooting. He circled the number 4 on the photo and placed the date and his initials next to the photo. The person shown in photo number 4 is Jamaal Curry Johnson, the defendant here. (<u>See</u> Government's Motion Hearing Exhibit Number 38).

<u>Discussion</u>

Defendant seeks to suppress the identification testimony of two witnesses, Travis Deal and Joseph Middendorf, on the grounds that they were the result of unduly suggestive identification procedures and that the identifications are unreliable. <u>See</u> General Principles § 4.

<u>Witness Travis Deal</u>

At the pretrial motion hearing Travis Deal testified that at the time of the shooting on May 11, 2004, as described above, he was able to see the person shooting at him. Although late at night the area was lit by street lights. Deal testified that he recognized the person shooting at him as a person known to him by

the nickname of "Little Woodie." Deal testified that he knew Little Woodie from the neighborhood and had purchased drugs from Little Woodie in the past. Although he knew the identity of his assailant, Deal did not inform law enforcement officials of this fact when initially interviewed. During an investigation of the incident conducted by the St. Louis Missouri Metropolitan Police Department Officer Matthias Hanewinkel learned that Deal had told other persons that "Woodie" and "Baby Tracy" were persons responsible for the shooting. On July 9, 2004, Officer Hanewinkel met with Deal. Deal again denied to Officer Hanewinkel that he knew the person or persons who shot at him. On that date Officer Hanewinkel displayed a group of ten photographs to Deal that Officer Hanewinkel had assembled. Officer Hanewinkel assembled photographs of persons whom he knew frequented the neighborhood where the incident had occurred. Included in the array were photos of Jamaal Johnson and Tracy Darnell Johnson. Deal told Officer Hanewinkel that the photograph of Jamaal Johnson depicted the person known to him as "Woodie" and that the photograph of Tracy Darnell Johnson depicted the person known to him as "Baby Tracy". On October 29, 2009, Agent Frank contacted Deal who was then confined at the Pettis County Jail. Deal had been told through his attorney that if he cooperated with law enforcement officials in their investigation of the events of May 11, 2004, his cooperation would be known to persons prosecuting charges then pending against

Deal. On that date Agent Frank showed a photographic display of six persons to Deal. Deal identified the person shown in the photograph marked #4 as a person involved in the shooting. Photo #4 depicted the defendant Jamaal Johnson.

Based on the evidence now before the court the undersigned finds that there was nothing suggestive in the manner or method in which the photos were displayed to Deal on either July 9, 2004 or October 29, 2009. There is no evidence that either Officer Hanewinkel or Agent Deal suggested in any way that Deal should identify any person shown in the photos. Moreover, a review of the photos themselves shows nothing suggestive. Each photo depicts an upper body and head photo of a young African American male. Nothing in the photos of the defendant highlights his photo in any particular way. Therefore, witness Deal's identification of the defendant was not the product of undue suggestion of the officers.

Furthermore, Deal's identification appears to be reliable. Deal testified that he was able to see the persons shooting at him. The evidence shows that the shooters were a mere car width away from Deal at the time of the shooting and that the area was lit by street lamps. Most significantly Deal was familiar with the defendant from seeing him in the neighborhood and on account of having purchased drugs from the defendant in the past. This factor adds greatly to the reliability of the identification.

"Witnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification." Haliym v. Mitchell, 492 F.3d 680, 706 (6th Cir. 2007). See also United States v. Burgos, 55 F.3d 933, 942 (4th Cir. 1995) (Identifications reliable because witnesses had known defendant for several months from prior dealings and from seeing defendant in the neighborhood).

The defendant claims that the procedures used in showing the two photographic displays to Deal was unduly suggestive because Jamaal Johnson was the only person shown in both photographic displays. (The undersigned notes that the photo of defendant in each of the displays appears to be different photos of the defendant.) This procedure was not impermissibly suggestive. United States v. Johnson, 56 F.3d 947, 953-54 (8th Cir. 1995); United States v. Gipson, 383 F.3d 689, 697-98 (8th Cir. 2004).

Although Deal initially said and on several occasions thereafter continued to maintain that he did not know who did the shooting, the undersigned concludes that such statements were the result of Deal's unwillingness to cooperate with law enforcement investigators rather than an inability to identify persons involved in the shooting.

Witness Joseph Middendorf

   At the pretrial motion hearing Joseph Middendorf testified that at the time of the shooting on May 11, 2004, he was able to see the people who did the shooting. He was standing on a porch of a house adjacent to the street where the car containing the shooters was situated. Middendorf testified that the area was lit by street lights. At one point one of the shooters looked directly at Middendorf. Middendorf, who stood about fifteen yards from the man, looked eye to eye with the man. Middendorf was able to see that the man was dark skinned and very thin. The man had gold teeth.

   On February 8, 2006, Officer Hanewinkel met with Middendorf. He displayed to Middendorf two separate photographic displays. Each display contained photographs of six persons. Middendorf was asked if he recognized any of the persons shown in the photographic displays as anyone involved in the shooting on May 11, 2004. Middendorf said that the person shown in photograph #6 of the first display was the person who had looked at him and pointed a gun at him on the evening of the shooting. Photograph #6 depicted the defendant Jamaal Johnson. In the second photographic display Middendorf said that the person depicted in photograph #2 was the person who was driving the car in which the shooters rode. Photograph #2 depicted Tracy Johnson. On the following day Middendorf viewed a live lineup of five individuals and was asked

if any of the persons in the lineup were involved in the May 11, 2004, shooting. Middendorf identified the person standing in position number 3 as a person involved in the shooting. The person standing in position number 3 was the defendant Jamaal Johnson.

The defendant claims that these procedures were unduly suggestive because the defendant was the only person shown in both the photographic display shown to Middendorf on February 8, 2006, and the live lineup viewed by Middendorf on February 9, 2006. This procedure was not impermissibly suggestive. See United States v. Johnson, 56 F.3d 947, 953-54 (8th Cir. 1995); United States v. Gipson, 383 F.3d 689, 697-98 (8th Cir. 2004).

Based on the evidence now before the court the undersigned finds that there was nothing suggestive in the manner or method in which the photos were displayed to Middendorf on February 8, 2006 or in the lineup procedure on February 9, 2006. There is no evidence that Officer Hanewinkel suggested in any way that Middendorf should identify any person shown in the photos or the lineup. Moreover, a review of the photos themselves and of the photo of the lineup shows nothing suggestive. Each photo depicts an upper body and head photo of a young African American male. Likewise, all five persons standing in the lineup were young African American males of similar height, weight and description. Nothing in the photo of the defendant or the lineup highlights him in any particular way. Therefore, witness Middendorf's

identifications of the defendant were not the product of undue suggestion of the officers.

Middendorf's identification appears reliable. He had an adequate opportunity to see the person who pointed the gun at him and was able to describe the person. And although a significant period of time passed between the occurrence and Middendorf's first identification, Middendorf seemed certain in his identification of the defendant.

The defendant also contends that the lineup conducted on February 9, 2006, was unlawful because he was not provided counsel at the time of the lineup. In United States v. Wade, 388 U.S. 218 (1967) the Supreme Court held that a defendant is entitled to counsel at a post-indictment lineup. If counsel is not provided the identification testimony is not admissible. Gilbert v. California, 388 U.S. 263, 272 (1967). However, the right to counsel attaches only after the initiation of adversarial judicial proceedings either by formal charge, indictment, information or otherwise. The defendant is not entitled to counsel at a lineup absent such adversarial proceedings. Kirby v. Illinois, 406 U.S. 682, 688-90 (1992). There is nothing in the evidence to show that adversarial judicial proceedings had been instituted against the defendant resulting from the events of May 11, 2004. Therefore, he was not entitled to counsel at the lineup on February 9, 2006. It does not matter that the defendant may have been in custody on

unrelated matters. "[O]nly those identification confrontations which occur after the defendant had been formally charged with the offense for which the identification testimony is sought require the presence of counsel." <u>United States v. Powell</u>, 853 F.2d 601, 604 (8th Cir. 1988), quoting <u>Sanchell v. Parrat</u>, 530 F.2d 286, 290 n.2, (8th Cir. 1976). In any event, an in court identification of the defendant by the witness may be admissible if it can be shown that the identification is independent of the inadmissible pretrial identification. <u>United States v. Wade</u>, 388 U.S. at 240-41.

<u>Events of June 30, 2004</u> (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 119-132)

<u>Findings of Fact</u>

On June 30, 2004, Officers of the St. Peters, Missouri, Police Department were in pursuit of a vehicle. The pursuit led into the City of St. Louis, Missouri. The pursuit ended when the vehicle being pursued crashed into another car at the intersection of Kennerly and Whittier streets in the City of St. Louis. Officers of the St. Louis Metropolitan St. Louis Police Department, including Officer Mike Mathews, arrived at the scene to assist the St. Peters officers.

Officer Mathews was standing near one of the vehicles involved in the accident when he saw a man, later identified as Jamaal Curry Johnson, the defendant here, approach the vehicle. Johnson then opened the front passenger side door of the vehicle

and reached toward the floorboard area. Officer Mathews, who was standing near the back of the car then approached Johnson and asked Johnson what he was doing. Johnson stood up and looked at Officer Matthews. Johnson then removed from his pants pocket a plastic baggie containing a green substance and tossed it into the car into which he had earlier reached. Officer Mathews believed that the substance in the bag was marijuana. Officer Mathews then called for a nearby officer to detain Johnson while Officer Mathews further investigated. Officer Mathews retrieved the baggie from the car. Johnson was then placed under arrest.[3]

Discussion

        In his post-hearing memorandum of law the defendant asserts as grounds to suppress the evidence seized that the seizure was the result of the unlawful detention of the defendant on the scene by Officer Mathews.

        As noted in the findings of fact above, as Officer Mathews was standing near one of the crashed vehicles he saw the defendant approach the vehicle, open the front passenger door and reach to the floorboard area. Officer Mathews then approached the defendant and asked what he was doing. In his memorandum the defendant appears to contend that at that moment the defendant had

---

[3]As noted supra herein, Officer Mathews had previously arrested Johnson on September 5, 2001, for possession of crack cocaine. Officer Mathews testified that on June 30, 2004, he did not recognize the defendant as someone he had previously arrested.

been detained by Officer Mathews.  However, a police officer who merely asks a question of a person in a public place has not detained that person within the meaning of the Fourth Amendment. See General Principles § 1.A.  At that point the occurrence was merely a consensual encounter between Officer Mathews and Johnson. Johnson did not answer the question.  Rather, he stood up and looked at the officer.  Johnson then removed a plastic baggie containing what appeared to be marijuana from his pocket and tossed it into the car.  Officer Mathews then called for a nearby officer to detain Johnson while Officer Mathews further investigated.  It was only at that point that the defendant was detained within the meaning of the Fourth Amendment.  At that point the detention had become a lawful investigative stop because Officer Mathews had a reasonable suspicion that the plastic bag the defendant threw in the car contained marijuana and that the defendant had committed the crime of possession of marijuana.  The detention of the defendant at that point was lawful.  See General Principles, § 1.B.

The plastic baggie was abandoned by the defendant when he threw it into the car and the seizure of the bag containing marijuana was lawful.  See General Principles § 2.D.(ii).

Events of March 2005, Pre-Parole Hearing Interview Of Jamaal
        Curry Johnson (Transcript of Hearing, January 21, 2011,
        Docket No. 88, Pp. 2-47)

Findings of Fact

In March, 2005, Helen Trippensee, was employed as a

parole officer within the institutions of the Missouri Department of Corrections.  As a part of her duties she conducted interviews of inmates who were eligible for parole and who would be appearing before the parole board for a hearing.  The purpose of the interviews was to gather information that the parole board might consider relevant in determining whether or when an inmate should be granted parole.  Ms. Trippensee conducted fifteen to twenty-five such interviews each month during the thirteen years she was so employed.

At the time of the interview the inmate would be summoned to Ms. Trippensee's Office within the institution.  The interviews were voluntary and an inmate could choose not to participate in the interview.  However, if an inmate chose not to participate in the interview, the inmate was told that the Parole Board would be told of such refusal.

In March, 2005, Ms. Trippensee conducted a pre-parole hearing interview of Jamaal Curry Johnson.[4]  Johnson was then serving a three year sentence at the Algoa Correctional Center in Jefferson City, Missouri, for a conviction for Possession of a Controlled Substance imposed in the Circuit Court of St. Louis County, Missouri on January 13, 2005.  Following the interview Ms.

---

[4]The exact date of the interview is not shown in any of the evidence adduced at the motion hearing.  Ms. Trippensee's Pre-Hearing Report is shown completed on March 15, 2005, and is dated March 23, 2005.

Trippensee prepared a written report.  Some of the information in the report was taken from institutional records and other information came from Johnson's answers to questions put to him by Ms. Trippensee during the interview.  Some of the statements made by the defendant related to his past involvement in criminal activity.  In her report Ms. Trippensee recommended to the Board of Probation and Parole that the defendant be granted a parole date of October 25, 2005.  Nevertheless, he was admitted to parole on May 19, 2005.  (See Government's Exhibit YY - Pre-Hearing Report prepared by Helen Trippensee; Government's Exhibit XX - Missouri Revised Statutes, Chapter 217, Section 217.690; Government's Exhibit ZZ - Records of Missouri Department of Corrections.

Discussion

In his post hearing memorandum of law the defendant seeks to suppress the statements made to Ms. Trippensee on the grounds that he was in custody at the time of the interview with Ms. Trippensee and that he was not advised of the rights set out in Miranda v. Arizona.  See General Principles, § 3.

The requirements of Miranda may apply in some circumstances when a person imprisoned serving a sentence is interviewed by law enforcement officials.  See e.g. Mathis v. United States, 391 U.S. 1 (1968).  However, "incarceration does not ipso facto render an interrogation custodial." Leviston v. Black, 843 F.2d 302, 304 (8th Cir. 1988).  The "inherently compelling

pressures" of custodial interrogation do not exist merely because the defendant is confined in a prison setting. <u>Maryland v. Shatzer</u>, ___ U.S. ___, 130 S.Ct. 1213, 1216 (2010). A person is in custody within the meaning of <u>Miranda</u> if, under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 663-65 (2004). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thomson v. Keohane</u>, 516 U.S. 99, 112 (1995).

The circumstances of the interview at issue here show that the interview was a pre-parole hearing interview for the purpose of gathering information to submit to the parole board for its use in determining whether the inmate should be granted early release. The inmate's participation is voluntary. However, if an inmate declines to participate in the interview he will then be told that the parole board would be so advised. It appears that the pre-parole interviews are routine proceedings. Ms. Trippensee conducted fifteen to twenty-five such interviews each month for the entire thirteen year period of her employment with the Missouri Department of Corrections. Ms. Trippensee conducted each interview using a form that set out standard areas of inquiry. Each inmate

would be told to report to Ms. Trippensee's office within the prison facility. These procedures were used and followed during the interview of the defendant in March, 2005.

There is no evidence that the defendant was ever told that he was required to participate in the interview, nor is there any evidence to indicate that he ever said that he did not wish to participate. The defendant appeared for the interview when he was told to do so. There is no evidence that the defendant was in any way restrained during the interview. Upon completion of the interview the defendant returned to the prison population. The interview was conducted in a non-adversarial fashion. In the totality of these circumstances the defendant was not "in custody" within the meaning of Miranda at the time of the interview and his statements to Ms. Trippensee are not inadmissible even though made in the absence of Miranda warnings. Leviston v. Black, supra, United States v. Washington, 11 F.3d 1510, 1517 (10th Cir. 1993); Minnesota v. Murphy, 465 U.S. 420, 429-34 (1984).

Events of January 6, 2006 (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp 140-150; Transcript of Hearing, December 7, 2010, Docket No. 85, Pp. 82-173)

Findings of Fact

In the early afternoon hours of January 6, 2006, Ali Goodin, was standing near the front porch area at 4172 Ashland in St. Louis, Missouri. Goodin was speaking with several persons who lived at that address. Goodin noticed two cars driving down

-55-

Ashland Avenue.  In the second car Goodin noticed a person known to him as "Little Woodie."  Little Woodie was pointing a gun out of the car window.  Goodin had known Little Woodie for approximately ten years, having seen him in the neighborhood.  Also, Goodin, at some time in the past had hired Little Woodie to do some work on the speakers for his car.  Later, as Goodin stood talking in front of 4172 Ashland someone began shooting at him from the back area of the house.  Goodin recognized the person shooting at him as Little Woodie.  Someone was also shooting at him from the nearby intersection of Whittier and Ashland, at the front area of the house.  Goodin ran to a nearby house and sought shelter.  Goodin didn't speak with law enforcement officials about the incident until December 7, 2010.  At that time Goodin met with one of the Assistant United States Attorneys prosecuting this case and was told that if he cooperated in this prosecution that law enforcement officials would notify the parole board of his cooperation.  Goodin never viewed any lineup, photographic display, or other pretrial identification procedure relating to this investigation and prosecution.

Several residents of 4172 Ashland were present at the residence at the time of the occurrence on January 6, 2006, described above, including Gloria Johnson, Kesha Johnson and Tamika Johnson.

Gloria Johnson saw Ali Goodin run through a gate in her yard at 4172 Ashland. Goodin went to the front of the house and was speaking with other residents of the house. Gloria Johnson saw two cars driving down Fair Avenue toward Ashland. There were people hanging out the windows of one of the cars. When the cars got to the intersection of Fair and Ashland persons in the cars started shooting. Gloria Johnson ran to the upstairs of the residence and looked out a window. She saw someone shooting at Ali Goodin from the rear of her residence. She saw Goodin then run to the front of the residence and someone was shooting from the area of Whittier and Ashland. She then saw Goodin run to a house next door to hers. Gloria Johnson did not recognize any of the persons doing the shooting. Gloria Johnson then called the police. There is no evidence that Gloria Johnson ever viewed any lineup, photographic display or other pretrial identification procedure relating to this investigation and prosecution nor did she identify the defendant during her testimony at the pretrial motion hearing.

Tamika Johnson was inside the residence at 4172 Ashland on January 6, 2006, when she heard gunshots outside the residence. She ran toward the front of the house to secure her baby who was on the front porch of the house. When she got to the front of the house she saw Ali Goodin run out of the gangway next to the house. She saw a person known to her as "Little Woodie" shooting at Ali Goodin. She had known Little Woodie for three or four years from

seeing him in the neighborhood.  She saw Little Woodie get into a car and people in the car continued to shoot at Ali Goodin as he ran.  She recognized one of the other persons in the car as a person known to her as "Baby Tray."  At the motion hearing Tamika Johnson identified the defendant Jamaal Curry Johnson as the person she knew as Little Woodie.

Kesha Johnson was also present in the residence at 4172 Ashland on January 6, 2006.  In the early afternoon hours on that day she saw Ali Goodin come to the front of the residence and speak with persons inside the residence.  She then saw a car drive down Fair Avenue toward Ashland.  A person was hanging out a window of the car and was shooting a gun toward her residence.  Ali Goodin then ran toward the back of the residence.  Kesha Johnson went upstairs in the residence and looked out a window.  She saw a person in the back area of the house shooting a gun.  She didn't recognize the person.  She did recognize the person she had seen hanging out of the car and shooting as a person known to her as "Little Woodie."  Kesha Johnson recognized Little Woodie because she knew him from the neighborhood.  At the motion hearing Kesha Johnson identified the defendant Jamaal Curry Johnson, as the person known to her as Little Woodie.

Officer Craig Robertson of the St. Louis Metropolitan Police Department arrived at the scene shortly after the shooting. He spoke with Gloria Johnson who described the events and showed

Officer Robertson areas where several bullets had struck her home. Officer Robertson found and seized several bullets and shell casings from and around 4172 Ashland. (<u>See</u> Government's Exhibit Numbers 1A-1G – Photos of items.) While he was at the residence Officer Robertson learned that witnesses to the shooting had recognized one of the persons doing the shooting as Jamaal Johnson. Officer Robertson then returned to the police station. He assembled a photographic display of six photographs, one of which was a photo of Jamaal Johnson. Later that same evening Officer Robertson returned to the residence and showed the photographic display to Kesha Johnson. Officer Robertson did not suggest that a photo of a suspect was in the display. Upon viewing the display Kesha Johnson said that she recognized the person shown in photo number 1 as the person known to her as "Little Woodie" and who she had seen shooting earlier that day. At Officer Robertson's direction Kesha Johnson then circled the photo she had selected and placed her initials on the photo. (<u>See</u> Government's Exhibit 36 – Photo Display).

<u>Discussion</u>

Defendant seeks to suppress the identification testimony of witnesses Gloria Johnson, Tamika Johnson, Kesha Johnson and Ali Goodin, on the grounds that such testimony is the result of unduly suggestive pretrial procedures and/or are unreliable. <u>See</u> General Principles, § 4.

<u>Witness Kesha Johnson</u>

At the pretrial motion hearing Kesha Johnson testified that on January 6, 2006, as she was standing at the front of the residence at 4172 Ashland, she saw a car drive down Fair Avenue toward Ashland Avenue. A person was hanging out of the car and firing shots toward her residence. She recognized the person hanging out of the car and shooting as a person known to her as "Little Woodie." Johnson knew Little Woodie from seeing him in the neighborhood. After the incident residents of the home called police. Officer Craig Robertson responded to the call. While at the residence he learned that some witnesses to the incident had recognized one of the persons involved in the incident to be Jamaal Johnson. Officer Robertson upon completion of processing the scene returned to the police station. He compiled a photographic display. The display contained six photographs. Each photograph depicted the upper body and head/face of a young African American male. All of the persons shown in the photos are of similar appearance. Officer Robertson returned to the Ashland residence in the evening hours of January 6, 2006. He showed the photographic display to Kesha Johnson. Kesha Johnson told Officer Robertson that the person depicted in photo #1 in the display was the person known to her as Little Woodie and the person she had seen shooting earlier in the day. The person depicted in photo #1 is Jamaal Curry Johnson, the defendant here.

Based on the evidence now before the court the undersigned concludes that there was nothing suggestive in the manner or method in which the photographic display was presented to Kesha Johnson on January 6, 2006. There is no evidence that Officer Robertson suggested in any way that Johnson should identify any person shown in the photographic display. A review of the photos themselves shows nothing suggestive. Nothing in the photographic display highlights the defendant's photo in any particular way. Therefore, witness Kesha Johnson's identification was not the product of undue suggestion.

Moreover, Kesha Johnson's identification has indicia of reliability. She had ample opportunity to observe the incident and the defendant. She was able to describe the incident in detail. Most significantly, she knew and was familiar with the defendant prior to the incident. See Haliym v. Mitchell, 492 F.3d 680, 708 (6th Cir. 2007); United States v. Burgos, 55 F.3d 933, 942 (4th Cir. 1995).

Witnesses Gloria Johnson, Tamika Johnson and Ali Goodwin

Evidence adduced at the pretrial motion hearing shows that none of these witnesses participated in any pretrial identification procedures. Therefore, any identification of the defendant by these witnesses cannot be the product or result of any unduly suggestive pretrial identification procedures.

The defendant asserts that the identification testimony of these witnesses at trial should not be allowed because unreliable. He claims that their testimony at the pretrial motion hearing was inconsistent and contradictory. These are matters for the jury to resolve. "[W]e accept as a natural attribute of the adversary system that internal contradictions within the testimony of individual witnesses, as well as contradictions between witnesses, are inevitable, and are matters to be resolved by the fact finder based upon its sense of credibility." Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir. 1984).

Events of July 14, 2008 (Transcript of Hearing, December 6, 2010, Docket No. 84, Pp. 150-165)

Findings of Fact

On July 14, 2008, at about 10:30 p.m., Officer Bradly Owens and his partner of the St. Louis Metropolitan Police Department were on patrol in the 4500 block of Cote Brilliante in the City of St. Louis, Missouri. As they approached 4562 Cote Brilliante they saw an individual sitting on the front porch. The person matched the description of a person who had run away from the officers earlier in the evening. The officers parked in front of 4562 Cote Brilliante and got out of their marked police car. The officers then approached the residence. Officer Owens wanted to interview the person on the porch to determine if he was the same person who had run away earlier in the evening. As they did

so, the person on the porch, later identified as Jamaal Curry Johnson, the defendant here, stood up.  As he stood up Johnson dropped an object from his hand onto the sidewalk.  Johnson then began walking toward a gangway at the side of the building. Officer Owens told Johnson that he wanted to speak with him. Johnson stopped walking.  Officer Owens retrieved the item which Johnson had dropped and found it to be a plastic baggie containing four individually wrapped chunks of what appeared to Officer Owens to be crack cocaine.  Officer Owens then told Johnson that he was under arrest.  Johnson then ran through the gangway toward the back of the residence.  As he reached the backyard area Johnson was confronted by another officer who had approached the residence from the rear alleyway.  Johnson stopped running.  He was then placed under arrest for possession of a controlled substance.

Discussion

As grounds to suppress the evidence seized the defendant asserts that the officers had no reasonable suspicion to believe that the defendant had committed or was committing an offense and therefore no basis on which to lawfully detain him and that the subsequent seizure of evidence was therefore unlawful.

As noted in the findings of fact above, Officer Owens got out of his police car and approached the defendant as he was sitting on the porch at 4562 Cote Brilliante.  Officer Owen wanted to interview the defendant about events earlier in the evening.  In

his memorandum the defendant appears to contend that the defendant was detained at the moment Officer Owens got out of his police car and approached the defendant.  However, a police officer does not violate the Fourth Amendment merely by approaching a person on the street with the purpose of asking questions of the person and determining if the person is willing to answer questions.  <u>See</u> General Principles, § 1.A.  As the officer approached, the defendant stood up and dropped an object from his hand onto the sidewalk.  The defendant then began to walk away.  Officer Owens then said that he wanted to speak to Johnson and Johnson stopped walking.  At this point this continued to be a consensual encounter between Officer Owens and the defendant.  <u>See</u> General Principles, <u>Id.</u>  Officer Owens then retrieved the object which the defendant had dropped and found it to be a plastic bag containing four individually wrapped chunks of what appeared to be crack cocaine. The seizure of the bag and its contents was lawfully seized by Officer Owens because it had been abandoned by the defendant.  <u>See</u> General Principles, § 2.B.  Officer Owens then told the defendant that he was under arrest.  The defendant ran away but was apprehended a short distance away.  Only then was there a seizure or detention of the defendant within the meaning of the Fourth Amendment.  <u>California v. Hodari D.</u>, 499 U.S. 621 (1991).

(Transcript of Hearing, December 7, 2010, Docket No. 85,
Pp. 12-75, Pp. 247-254)

Findings of Fact

In the early morning hours of September 5, 2008, Officer Harvey Burnett was parked in his marked police vehicle on Theresa Street near Olive Street in St. Louis, Missouri. Officer Burnett was speaking with another officer about an incident which occurred earlier that night.

Officer Burnett then saw two cars drive through the stop sign at the intersection of Theresa and Olive Streets. Both cars then came to an abrupt halt and stopped diagonally to each other. Officer Burnett heard what sounded like muffled backfiring of a vehicle. Officer Burnett decided to investigate and drove his police vehicle to the location of the two cars. He noticed one car to be a silver colored 2004 Chevrolet Impala and the other to be a white colored SUV. Officer Burnett parked his police vehicle behind the Chevrolet Impala, got out of his police car and began to approach the Impala. As he did so gunfire erupted between the occupants of the Impala and the SUV. Officer Burnett retreated to his police vehicle and called for assistance. Both the Impala and the SUV then left the area, driving west on Olive. Officer Burnett pursued in his police car.

When the Impala and the SUV reached the intersection of Grand and Olive Streets the Impala turned left onto Grand Avenue

and drove south.  The SUV turned right onto Grand Avenue and drove north.  Officer Burnett decided to follow the Impala.  As the Impala drove south on Grand Avenue with Officer Burnett in pursuit an occupant of the Impala pointed a rifle out the window of the Impala and fired shots at Officer Burnett.  The pursuit continued with the Impala driving onto Highway 40 going east.  As Officer Burnett followed shots were again fired at him from the Impala.  The Impala traveled east on Highway 40, exiting into East St. Louis, Illinois.  The Impala drove thorough streets of East St. Louis and eventually traveled back onto Highway 40 going west, with Officer Burnett following all the while.  The Impala drove back into St. Louis and eventually exited Highway 40 and began driving through the streets of St. Louis.  Officer Burnett followed.  Eventually the Impala stopped when it crashed into a dumpster in an alley behind the 4200 block of Cote Brilliante Street.  (See Government's Exhibit 30 - Photo of Impala and dumpster).

Immediately after the Impala crashed all four doors of the vehicle flew open and Officer Burnett saw five persons get out of and run from the Impala.  Three of the persons got out on the passenger side and two got out on the drivers side.  All of the persons who ran from the Impala were wearing black clothing. Officer Burnett was able to see one person in particular as he ran from the vehicle.  That was the person who got out of the rear drivers side of the car.  Officer Burnett stopped his police car

about twenty feet behind the Impala when it came to a halt at the dumpster. He shined the spotlight of his police car on the Impala. As the person in the rear drivers side got out of the Impala he glanced in Officer Burnett's direction and Officer Burnett was able to see the person's face which was illuminated by the spotlight. Officer Burnett broadcast a general description of the persons who ran from the scene as five black males, all dressed in black clothing.

Officer David Calcaterra of the St. Louis, Metropolitan Police Department was on duty and on patrol in the early morning hours of September 5, 2008. He was listening to the details of Officer Burnett's pursuit of the Impala as it was being broadcast on the police radio. Officer Calcaterra drove his police car to the area toward which he believed the Impala was headed. As he drove in the 4200 block of Garfield Street Officer Calcaterra saw a person wearing black clothing being pursued by another officer, Officer Smoote, on foot. Officer Calcaterra got out of his police car and joined the chase. He was able to tackle the suspect and to place him in handcuffs. Officer Calcaterra then advised the suspect of the <u>Miranda</u> warnings, by reading them from a card. Specifically, he advised the suspect that he had the right to remain silent; that anything he said could be used against him, that he had the right to an attorney and that if he could not afford an attorney one would be provided for him. The suspect said

that he understood his rights and indicated that he was "not going to say anything". Officer Calcaterra then searched the suspect's person and found and seized a baggie containing a large number of pills, a small scale, a cellular telephone, and $1,759.00 in currency.

The person arrested by Officer Calcaterra was taken back to the area where the Impala crashed. Officer Burnett identified the suspect as the person he had seen get out of and run from the rear drivers side of the Impala. The suspect was later identified as Jamaal Curry Johnson, the defendant here. Several other persons matching the description of the subjects who had run from the Impala were apprehended and brought to the scene but Officer Burnett was unable to identify any of those persons because he had not seen the faces of any of the other occupants at the time they ran away.

Officer Burnett and other officers searched the Impala and surrounding area. They found and seized several items including a rifle and several handguns. (See Government's Exhibits 25-28, 30-31 - Photos of items seized).

Officer Harvey Graef of the St. Louis Metropolitan Police Department, Evidence Technician Unit was dispatched to the scene of the initial incident in the 3500 block of Olive. There he found in the street, and seized, a number of shell casings and a 9 millimeter pistol. (See Government's Exhibits 29, 32-35 - Photos

of items seized).

On September 6, 2008, Officers Paul Henkhaus and Sam Monti of the St. Louis Metropolitan Police Department went to the St. Louis City Justice Center (Jail) for the purpose of interviewing Jamaal Johnson who was then confined at that facility. The purpose of the interview was to question the defendant concerning the events of September 5, 2008, described above and to determine the identities of others who might have been involved. The officers were unaware that following his arrest on the day before, the defendant after being advised of his <u>Miranda</u> rights, had stated that he was not going to say anything. The interview took place in a room within the Justice Center. The defendant was not handcuffed or otherwise physically restrained during the interview because the interview was being conducted in a secure facility. At the beginning of the interview Officer Henkhaus advised the defendant of the <u>Miranda</u> rights by reading them from a card. Specifically, he advised the defendant that he had the right to remain silent; that anything he said could be used against him; that he had the right to a lawyer and to have the lawyer present during questioning if he wished; that if he could not afford a lawyer one would be appointed for him before questioning if he wished; and that he could choose to not answer questions or make any statements. The defendant said that he understood these rights and agreed to answer questions. The interview then proceeded and

lasted 20-30 minutes.  At no time during the interview did the defendant say that he did not wish to answer questions, nor did he ever ask to speak with a lawyer.  The defendant did not appear to be under the influence of drugs or alcohol, nor did he appear to be in any physical distress.  The defendant was coherent and cooperative throughout the interview.

A day or two later Officer Henkhaus again went to the Justice Center to interview the defendant.  The purpose of the interview was again to obtain further information about the events of September 5, 2008.  At the beginning of the interview Officer Henkhaus again advised the defendant of the same <u>Miranda</u> rights as he had previously advised the defendant on September 6, 2008, again by reading them from a card.  The defendant said he understood these rights and agreed to answer questions.  The defendant did not ask to speak to a lawyer at any time during the interview.  The defendant was cooperative throughout the interview.

In April 2009, Special Agent Joseph Frank of the Bureau of Alcohol, Tobacco and Firearms opened an investigation relating to the defendant.  The investigation encompassed all of the events described above, including the incident which occurred on September 5, 2008.  Agent Frank learned that a cellular telephone had been seized from the defendant at the time of the defendant's arrest on September 5, 2008.  Agent Frank took custody of the telephone from the St. Louis Metropolitan Police Department.  On July 17, 2009,

Agent Frank applied for a warrant to search the telephone for subscriber information stored in voice mail messages, records of calls placed from the telephone; records of calls received by the telephone; stored text messages sent or received by the telephone, contact lists maintained in the telephone and device numbers assigned to the telephone. The application was made to United States Magistrate Judge Terry I. Adelman and was accompanied by the sworn affidavit of Agent Frank. The affidavit set out the events of September 5, 2008, which led to the seizure of the telephone from the defendant. The affidavit described that laboratory analysis of the pills seized from the defendant showed that the pills were controlled substances, namely ecstacy and BZP. The small scale seized from the defendant had traces of cocaine base on it.

The affidavit noted that several of the shell casings and one of the guns seized on September 5, 2008, had been linked by ballistic evidence to several prior assaults and two homicides. The affidavit noted that the defendant had prior felony convictions for drug and gun offenses and was on supervision for a prior conviction at the time of his arrest on September 5, 2008. The affidavit went on to state as follows:

> Based on my training and experience involving drug
> conspiracies and violent crimes, suspects
> communicate with each other utilizing cell phones
> to arrange the distribution of controlled
> substances. I believe that Johnson's cell phone

contains contact information and communications
from the passengers who escaped from the Impala and
SUV.  I have consulted with a computer recovery
specialist with ATF  and it is my understanding
that to properly and fully retrieve and analyze all
cell phone data, to document and authenticate such
data and to prevent the loss of the data either
from accidental or deliberate destruction, it is
necessary that the cell phone be analyzed by a
experts (sic) in a controlled environment.

Based on my consultations with experts in this
field, I am also aware that located in the memory
of typical cell phones are, among other things,
telephone numbers regularly dialed by the cell
phone user, recently dialed numbers, stored text
messages, stored emails, and names and telephone
numbers stored in the cell phone address book.
Some phones also store photographs, images and
other information.

Based on the information set out in the affidavit the Magistrate

Judge found probable cause to believe that the described items were

evidence of crimes and that the described items could be found in

the telephone and issued a warrant to search the telephone for the

described data.  (See Government's Exhibit 33 - Application,

Affidavit and Search Warrant).  Thereafter, on July 20, 2009, the

search warrant was executed and data was seized from the telephone.

(See Government's Exhibit 37- Search Warrant Return).

Discussion

Arrest of Defendant on September 5, 2008

As grounds to suppress evidence seized the defendant

asserts in his post-hearing memorandum of law that he was arrested

without probable cause and that the subsequent seizure of items

from his person was the result of his unlawful arrest.

Officer Calcaterra was monitoring the police broadcast of the vehicle chase and went in his police vehicle to the area where the chase was occurring. After the Impala crashed in the alleyway at the rear of the 4200 block of Cote Brilliante five individuals jumped out and ran from the car. Officer Burnett broadcast a general description of the persons who had run from the car as black males, all dressed in black clothing. Officer Calcaterra was driving in the 4200 block of Garfield when he saw an individual matching the description broadcast by Officer Burnett. The individual was running and being chased by Officer Smoote on foot. Officer Calcaterra then got out of his car and tackled and subdued the man in black, later determined to be Jamaal Curry Johnson, the defendant here. Officer Calcaterra then placed the defendant under arrest. He searched the defendant's person and seized a number of items found on the defendant's person including drugs, currency, a scale and a cellular telephone.

Officer Smoote did not testify at the motion hearing. Therefore, the details and circumstances of his initial encounter with the defendant are unknown and not a matter of record in this proceeding. Officer Calcaterra at the time he arrested the defendant had knowledge of the following facts. He was listening to the police broadcast of the chase and would have been aware of the events occurring during the chase, including that shots had

been fired at Officer Burnett during the chase. He also heard Officer Burnett's description of the person who fled the scene following the crash of the Impala. He saw a person fitting that description running with Officer Smoote in pursuit in the 4200 block of Garfield, shortly after the description was broadcast. The undersigned takes judicial notice that the 4200 block of Garfield is approximately 2 blocks from the location where the Impala crashed. This event occurred in the early morning hours and it is unlikely that many persons were out and about on the streets at that time. Therefore it is reasonable for Officer Calcaterra to believe, as he did, that the person he saw running was one of the persons that had fled from the Impala. Officer Calcaterra had probable cause to arrest the defendant, that is, at the moment the arrest was made the facts and circumstances within his knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense. The undersigned also notes that R.S.Mo. § 575.010 makes it a criminal offense to resist arrest by fleeing from an officer attempting to lawfully detain or arrest a suspect. Officer Calcaterra had probable cause to arrest the defendant for this offense as well as others. The items found on and seized from the defendant were found and seized in a search incident to the arrest of the defendant and were thus lawfully seized. <u>See</u> General Principles, § 2.D.(i).

Even if he did not have probable cause to arrest the defendant Officer Calcaterra had a reasonable suspicion that the person he saw running was one of the suspects who had run from the crashed vehicle. He thus had reason to detain the suspect and take him back to the scene where Officer Burnett was located in order to determine if Officer Burnett was able to identify the suspect as one of the persons who had run from the vehicle. <u>See</u> General Principles, § 1.B. Once Officer Burnett identified the defendant as the person he had seen run from the rear drivers side of the car there was certainly probable cause to arrest the defendant. <u>See</u> General Principles, § 1.C. The items found and seized by Officer Calcaterra upon his original seizure of the defendant would have inevitably been discovered on the defendant's person even if he would not have been arrested until after identified by Officer Burnett. The evidence is therefore admissible. <u>United States v. Munoz</u>, 590 F.3d 916, 923 (8th Cir. 2010).

<u>Interview And Statement Of Defendant On September 6, 2008</u>

In his post-hearing memorandum the defendant asserts that his statements to Officer Henkhaus on September 6, 2008, should be suppressed because they were made after he invoked his right to remain silent and right to counsel following his being advised of the <u>Miranda</u> rights by Officer Calcaterra on September 5, 2008.

If a defendant invokes his Fifth Amendment right to remain silent police officials must scrupulously honor the

defendant's assertion of that right. <u>Michigan v. Mosley</u>, 423 U.S. 96 (1975). If a defendant invokes his Fifth Amendment right to counsel police officers must cease interrogation and cannot further question the defendant unless the defendant himself initiates further conversation. <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). The invocation of the right to remain silent and/or the right to counsel must be unequivocal and unambiguous. <u>Berghuis v. Thompkins</u>, _____ U.S. ___, 130 S.Ct. 2250 (2010); <u>Davis v. United States</u>, 512 U.S. 452 (1994); <u>U.S. v. Cloud</u>, 594 F.3d 1042, 1046 (8th Cir. 2010); <u>United States v. Ferrer-Montoya</u>, 483 F.3d 565, 569 (8th Cir. 2007). Nothing in the record here shows that the defendant made a clear, unequivocal and unambiguous request for counsel following the advise of <u>Miranda</u> rights by Officer Calcaterra. The defendant merely stated that he was "not going to say anything." A statement such as this is too ambiguous to constitute an invocation of the right to counsel. In its post hearing memorandum of law the government contends that the defendant's statement that he was "not going to say anything" was not a clear, unambiguous and unequivocal invocation of the defendant's Fifth Amendment right to remain silent. The argument finds some support in authority. <u>See</u> <u>United States v. Sherrod</u>, 445 F.3d 980, 982 (7th Cir. 2006) (Defendant's statement that he was "not going to talk about nothin" was ambiguous assertion of right to remain silent); <u>United States v. Lei Shi</u>, 525 F.3d 709, 729-30

(9th Cir. 2008) (Defendant's statement "I don't want to talk about the accident" ambiguous assertion of right to remain silent. <u>But see</u> <u>United States v. Rambo</u>, 365 F.3d 906, 910-11 (10th Cir. 2004) (Defendant invoked right to remain silent when answered "no" when asked if he wanted to talk about robberies). In <u>Hatley v. Lockhart</u>, 990 F.2d 1070 (8th Cir. 1993) the Eight Circuit treated a defendant's statement "that he did not wish to say anything" upon being advised of the <u>Miranda</u> rights as an invocation of the right to remain silent. The undersigned finds that the defendant's statement to Officer Calcaterra that he was "not going to say anything" was a clear, unambiguous and unequivocal assertion by the defendant of his right to remain silent. The evidence shows that following the defendant's assertion of that right Officer Calcaterra did not further question the defendant.

On the following day, September 6, 2008, Officers Henkhaus and Monti went to the jail facility where the defendant was housed for the purpose of interviewing the defendant about the incident of September 5, 2008, and specifically to learn the names of others who might have been involved. Before interviewing the defendant Officer Henkhaus fully and properly advised the defendant of the <u>Miranda</u> rights. After being so advised the defendant said that he understood those rights and agreed to answer questions. In <u>Michigan v. Mosley</u> the court looked to a number of factors in determining whether a defendant's invocation of the right to remain

silent had been scrupulously honored: (1) Whether the police immediately ceased the interrogation upon the defendant's request; (2) Whether they resumed questioning only after the passage of a significant period of time and provided a fresh set of <u>Miranda</u> warnings; and (3) Whether the later interrogation was restricted to a crime that was not the subject of the first interrogation. <u>Michigan v. Mosley</u>, 423 U.S. at 104. As to the first factor, the evidence shows that the police did not further question the defendant after he invoked his right to remain silent. As to the second factor the defendant was questioned on the next day following his invocation of the right to remain silent. This is a significant period of time. In <u>Michigan v. Mosley</u>, the court found that a two hour interval between the first and second questioning was a significant period of time. <u>See also</u> <u>Hatley v. Lockhart</u>, 990 F.2d 1070, 1073 (Two hour interval between interviews); <u>United States v. House</u>, 939 F.2d 659, 652 (8th Cir. 1991). As to the third factor, although the second interview related to the same matter under investigation "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." <u>United States v. House</u>, 939 F.2d at 662; <u>Hatley v. Lockhart</u>, 990 F.2d at 1074 (same); <u>United States v. DeMarce</u>, 564 F.3d 989, 994 (8th Cir. 2009). Nor is there any evidence that the officers engaged in any effort to wear down the resistance of the defendant to resist questioning. <u>See</u> <u>Hatley</u>,

<u>supra</u>, <u>DeMarce</u>, <u>supra</u>.

After being advised on his <u>Miranda</u> rights on September 6, 2008, the defendant said he understood those rights and agreed to answer questions.

<u>Search Of Cellular Telephone Seized From Defendant On September 5, 2008</u>

As grounds to suppress the search of the contents of the cellular telephone seized from the defendant on September 5, 2008, the defendant asserts in his post-hearing memorandum of law that the telephone was found and seized as a result of his unlawful arrest.  He also claims that there was insufficient probable cause for the subsequent issuance of the warrant to search the telephone issued on July 17, 2009.

The undersigned has previously found that the arrest of the defendant on September 5, 2008, was lawful, and alternatively, that the items found on the defendant's person would have inevitably been found and seized.  <u>See</u> Discussion, <u>supra</u> at Pp. 74-75.

The affidavit submitted in support of the application for a warrant to search the cellular telephone set out sufficient information to support the Magistrate Judge's finding of probable cause.  The affidavit set out the events of September 5, 2008, involving Officer Burnett and leading up to the arrest of the defendant and the seizure of the telephone from his person.  The affidavit also set out that the guns and shell casings recovered at

the scenes of the events on September 5, 2008, had been linked by ballistic evidence to several assaults and homicides committed in 2008. The affidavit also set out the training and experience of the affiant in investigating those involved in drug conspiracies and violent crimes. The affidavit set out that based on such training and experience the affiant knew that those involved in such activity communicate with each other using cellular telephones and that evidence of such communications was likely to be found in the telephone seized from the defendant. Based on all of this the Magistrate Judge found probable cause to believe the described information could be found in the telephone and issued the warrant to search the telephone. The information in the affidavit was sufficient to support such finding. <u>See</u> General Principles, § 2.C.

Moreover, as asserted by the government in its post-hearing memorandum of law the officers executing the warrant were entitled to rely in good faith on the validity of the warrant issued by the Magistrate Judge. <u>United States v. Leon</u>, 468 U.S. 897, 920 (1984).

<u>Conclusion</u>

For all of the foregoing reasons the defendant's Motion To Suppress Statements And Illegally Seized Evidence; and Defendant's Motion To Suppress Identification Testimony should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion To Suppress Statements And Illegally Seized Evidence (Docket No. 43); and defendant's Motion To Suppress Identification Testimony (Docket No. 49) be denied.

The parties are advised that any written objections to these findings and determinations shall be filed not later than **December 29, 2011.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_____
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of December, 2011.